

# THE ATTORNEY GENERAL
## OF TEXAS

AUSTIN 11, TEXAS

Gerald C. Mann
XXXXXXXXXXXXXXXXXXXXXXXXX
ATTORNEY GENERAL

Honorable M. O. Flowers
Secretary of State
Austin, Texas

Attention: Mr. John Vickers

Dear Sir:

Opinion No. O-2327
Re: Agreement between Investors
Syndicate and Investors Mutual,
Incorporated.

   Your request for an opinion of this department has been received and considered. We quote the pertinent portion of your letter as follows:

"The Investors Mutual, Incorporated, a Nevada corporation, is organized for the purpose of operating an investment company. Said company will operate in this State in the following manner:

"The stock of such company will be sold in Texas by the parent company, Investors Syndicate, a Minnesota corporation, as an independent contractor rather than agent. The sales contract will be accepted and stock certificates issued in Minnesota.

"This department desires to know if in your opinion it is necessary for the Investors Mutual, Incorporated, to obtain a permit to do business in this State.

"A copy of the charter and sales contract is hereto attached and we request that same be returned to us. We also attach a brief prepared by Messrs. Black, Graves & Stayton of this city.

"In addition to the question propounded to you in the writer's letter of May 6, 1940, the writer will appreciate your answering this additional question:

    "Does the Investors Syndicate have the authority under its charter and the laws of Texas to enter into such an agreement as outlined in my letter of May 6?

    "In this connection you are advised that the Investors Syndicate secured a permit to engage in selling investment certificates."

   The Investment Syndicate is a foreign corporation domiciled in Minnesota with a permit to do business in Texas. The Investors Mutual, Incorporated, is a Nevada corporation desiring to transact or solicit business

in this State. The two concerns shall hereinafter be referred to as the Company and the Syndicate.

The Syndicate occupied the leading role in the formation and organization of the Company. Accordingly, as could be expected, the officers and directors of the Syndicate are those of the Company. Incidental thereto, the Syndicate owns or controls some 94% plus of the capital stock of the Company.

The primary purpose and powers of the Company, as set out in Section (a) of Article III of its Certificate of Incorporation, are as follows:

"(a) To subscribe for, receive, purchase, or otherwise acquire, underwrite, obtain an interest in, own, hold, pledge, hypothecate, mortgage, assign, deposit, create trusts with respect to, deal in, exchange, sell, and otherwiase dispose of, alone or in syndicates, or otherwise in conjunction with others, and generally deal in and with fully or partly paid securities of every description of, or created or issued by, any foreign or domestic governments, states, governmental or municipal bodies or political subdivisions, companies, trusts, associations, syndicates, partnerships, and/or persons. The term 'securities' as used in this Certificate of Incorporation shall be construed to include, without being limited to, shares, stocks, treasury stocks, including any stocks of this Company, notes, bonds, debentures, evidences of indebtedness, certificates of interest or participation in any profit sharing agreements, collateral trust certificates, reorganization certificates or subscriptions, transferable shares, investment contracts, voting trust certificates, certificates of deposit for a security, fractional or undivided interests in oil, gas, or other mineral rights, or any certificates of interest or participation in, temporary or interim certificates for, receipts for, guarantees of, or warrants or rights to subscribe to or purchase any of the foregoing, acceptances and other obligations, and any evidence of any right or interest in or to any cash, property or assets; . . .

". . .

"(d) To issue its own securities and to sell and exchange such securities and any certificates, receipts, warrants or other instruments representing rights to receive, purchase or subscribe for such securities, or representing any interest thereunder in such amounts and on such terms and conditions and for such purposes as the Board of Directors may, from time to time, determine, subject, however, to the provisions of the Certificate of Incorporation, or amendments thereto, and by By-laws of the Company;"

Obviously the above evidences that the Company is designed to operate as, and perform the functions of, an investment trust concern. The proposed business of the Company is described as follows, in its registration statement to the Federal Securities and Exchange Commission:

"The business intended to be done by the issuer is that of an investment company of the general management type with powers under its charter to carry on the general business of owning, holding and managing investments and doing a general investment business. Its acquisition and disposition of the securities other than obligations in the United States of America are restricted to those securities which shall receive the recommendation or approval of the issuer's investment manager, such recommendation or approval to include the amount, time and terms of such acquisition and/or disposition. In accordance with the provisions of the Articles of Incorporation of the issuer and pursuant to the terms of an agreement dated January 19, 1940, the Investors Syndicate, a Minnesota corporation, is the investment manager for the issuer.

"The issuer presently intends to buy and sell securities and to invest and reinvest its resources in accordance with the recommendations and approvals made to it by Investors Syndicate. . . ."

Briefly, the Company sells certificates of interest and participation to the investing public. The funds so derived are reinvested in a manner theoretically beneficial to all concerned. The certificate holder contemplates a pro rata share in the profits, if any, arising from the Company's reinvestment of their investment.

Pursuant to the Company's desire to offer these certificates to the investors of this State, and, as a matter of convenience, to do so without first submitting to the necessary formalities attending the acquisition of a permit, the Company has conceived and executed an agreement designed to attain their aspiration.

This agreement between Investors Mutual, Incorporated, and Investors Syndicate is rather lengthy and complex. However, from the following excerpts, the gist of the agreement may be obtained along with the sanctioning paragraph taken from Section (c) of Article III, Certificate of Incorporation:

"To enter into a contract or contracts wherein and whereby a responsible person, entity, syndicate, partnership, association or corporation is constituted and appointed the exclusive representative or agent of this Company with the exclusive right to sell, offer for sale, purchase, repurchase or redeem any of the securities issued by this Company and/or granting to said representative an exclusive right of management, investment and re-investment of the funds and assets of this Company; . . ."

Section (1) of Part One of the Agreement deals with the distribution of securities. It provides:

"(1) The Company hereby covenants and agrees that during the term of this contract and any renewal or extension thereof or until any prior termination thereof (hereinafter referred to as 'the period of this contact'),

the Syndicate shall have the exclusive right to offer for sale and to distribute any and all securities issued or to be issued by the Company, and more specifically, but without limiting the generality of the foregoing, all Special Stock Class 'A' shares of the Company authorized to be issued during the period of this contract.

"(2) The Syndicate hereby covenants and agrees to act as the sole distributor of the securities issued and to be issued by the Company during the period of this contract and agrees during such period to offer for sale and to sell such securities, including the Special Stock Class 'A' shares of the Company, and to continue the offering and sale of said securities, including said Special Stock Class 'A' shares, as long as said securities remain available for sale and distribution, unless the Syndicate is unable to make such sales or solicitations legally because of any federal, state, provincial or governmental law, rule or agency."

Part (a) of Section (4) provides:

"All sales of Special Stock Class 'A' shares of the Company shall be made by means of a written application in form approved by the Company and the Syndicate at the time of the signing of such application. Every such application shall be subject to acceptance or rejection by the Company at its principal place of business. Such shares of stock are to be sold for cash, payable at time the application for such shares is received at the principal place of business of the Company, . . ."

Part One, Sections:

"(8) The Syndicate agrees to submit to the Company for its prior written approval all circulars, sales literature, radio broadcast material, publicity data and other advertising material which is contemplated to be used by the Syndicate in the sale of securities issued by the Company.

"(9) The Syndicate agrees that all payments made for the purchase of securities issued or to be issued by the Company shall in all cases, except where actual cash is received, be made payable to the Company.

"(10) The Syndicate agrees to cause to be delivered to each person signing an application, a prospectus or circular to be furnished by the Company in the form which, at the time of the signing of such application, shall be required by any applicable Federal Securities Act or by the acts or statutes of any state, province or country in which such application is signed by the applicant.

"(11) The Syndicate covenants and agrees that during the period of this contract, it will not buy securities issued by the Company for its own account, except from the Company, and that it will not sell securities issued by the Company which have been purchased by the Syndicate for its own account, except to the Company."

Part Two of the Agreement concerns investment advice, statistical data, and recommendations as follows:

"(1) The Company hereby retains the Syndicate and the Syndicate hereby covenants and agrees, for the period of this contract and under the terms and conditions herein set forth, to furnish the Company with advice, statistical data and recommendations with respect to the Company's investments and to recommend and approve securities for acquisition and disposition by the Company.

"(2) The Company covenants and agrees that, during the period of this contract, it will purchase or otherwise acquire only such securities as may be recommended or approved by the Syndicate at the time of such purchase or other acquisition; . . .

"(3) The Company further covenants and agrees that, except as to obligations of the United States of America, it will sell, exchange or otherwise dispose of any part or all of its securities in such amounts at such time and upon such terms as may be recommended or approved by the Syndicate. . . .

"(4) The Company further covenants and agrees that, except as to obligations of the United States of America, it will sell, exchange or otherwise dispose of, only such securities as may be recommended or approved by the Syndicate for such sale, exchange or disposition.

"(5) The Syndicate agrees that all of its recommendations or approvals relating to the acquisition and disposition of securities by the Company shall be transmitted to the Company in writing, and the Company agrees to advise the Syndicate in writing (a) of all action taken by the Company with respect to any such recommendation or approval; (b) of all distribution received upon the cash, securities or other property of the Company; (c) of all liabilities charged or chargeable against the Company, and (d) of any other matters in connection with the assets and liabilities of the Company which may be requested by the Syndicate from time to time."

Part Four of said agreement deals with the compensation of the Syndicate:

"(1) The Company covenants and agrees to pay to the Syndicate, and the Syndicate covenants and agrees to accept from the Company, in full payment for the Syndicate's services hereunder, the following fees:

"(a) A fee equal to five and one-half per cent ($5\frac{1}{2}\%$) of the aggregate amount received by the Company for the sale of all Special Stock Class 'A' shares of the Company to be issued during the period of this contract (excepting, however, shares issued pursuant to the provisions of Part One, subparagraph 12 hereof). The amount of such fee shall be paid the Syndicate five (5) business days after the receipt and acceptance by the Company of the application for such shares.

"(b) A fee equal to one-eight of one per cent (1/8 of 1%) of
the value of the gross assets (as hereinafter defined) of the Company, as
of the close of business on the fifteenth day of March, June, September,
and December of each year shall be paid in cash, within five (5) business
days after each such fifteenth day of March, June, September and December,
respectively, of said year. . . .

"(c) A fee equal to 1½% of the liquidation value . . . of all
shares of the Company's capital stock outstanding for a period of less than
four years which are redeemed by the Company in each month during the periof
of this contract . . ."

Part Six of the agreement provides for the termination of the
Agreement:

"(1) This agreement shall continue in effect until the end of the calendar
year 1959 and shall continue from year to year thereafter, unless and until
terminated by either party as hereinafter provided."

Investors Syndicate is a loan and brokerage company within the
purview of Article 1524a, V.A.C.S., as amended. Section 1 of that Article
provides:

"This Act shall embrace corporations heretofore created and hereafter created
having for their purpose or purposes any or all of the powers now authorized
in Subdivisions 48, 49, or 50 of Article 1302, Revised Civil Statutes of
Texas, 1925, and heretofore or hereafter created having in whole or in part
any purpose or purposes now authorized in Chapter 275, Senate Bill Number
232 of the General and Special Laws of the Regular Session of the 40th Legis-
lature. No such corporation shall act as agent or trustee in the consolida-
tion of or for the purpose of combining the assets, business or means of
other persons, firms, associations, or corporations, nor shall such corpora-
tions as agents or trustees carry on the business of another . . ."

In enacting the above statutory provisions, the Legislature must
have used the term "business" in its ordinary significance. True, the word
is comprehensive; but, in our opinion, when applied to corporations, the
word necessarily implies those corporate activities and functions which are
authorized by and engaged in pursuant to the provisions of their charter.
It means the transaction of those affairs and the fulfillment of those pur-
poses for which the corporate entity was designed and organized.

With this in mind, we perceive the sale of securities and cer-
tificates along with investment of the proceeds therefrom as primarily and
essentially the business of the Investors Mutual, Incorporated. This is
its admitted corporate purpose. This being true, it cannot be denied that
contact with the investing public is of the greatest importance and highly
necessary for the transaction of the corporate business. Investors Syndi-
cate has contracted to perform this indispensable corporate function.

Not only has the syndicate agreed to sell any and all securities issued or to be issued by the Company, but it has gone further and bound itself to tend the proper investment of any proceeds or funds derived from those sales.

After careful consideration of the agreement and the attending facts of the situation presented to us, we reach our conclusion, and you are advised that Investors Syndicate is not authorized under the laws of this State to enter into the agreement which, in effect, makes the Syndcate the agent of the Company and to such a degree that the Syndicate, as a practical matter, carries on the business of the Company within the meaning of Article 1524a, supra. In other words, any overt act underaken by the Syndicate which constitutes, or tends to constitute, either directly or indirectly, an effort to effect the intent, purposes, or aims of the contracting parties, as expressed in this agreement, will be achieved only by a violation of the law and an overstepping of its announced corporate powers; thus, subjecting itself to the penalty announced in section 10 of Article 1524a.

Furthermore, we find, that there is no more than a mere temporary or spasmodic relationship between the corporations. There is an element of comparative permanence discernible here.

This conclusion precludes our consideration of any question as to whether Investors Mutual, Incorporated, must first comply with Article 1529, Revised Civil Statutes of Texas, 1925, and obtain a permit before operating in Texas under the contemplated arrangement.

Trusting that this fully answers your inquiry, we remain

Yours very truly

APPROVED JUNE 8, 1940
/s/ Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

ATTORNEY GENERAL OF TEXAS

Approved: Opinion Committee
By B W B Chairman

By /s/ Wm. J. Fanning

Wm. J. Fanning
Assistant

By /s/ Grundy Williams

GW:jm:egw